AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

5/28/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>3724 Applegate Avenue, Cincinnati, Ohio, including any<br>curtilage, outbuildings, or garages at this location | )<br>)<br>)<br>)<br>)<br>)   Case No.   3:21MJ221 |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Attachment G

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*

Attachment H

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute/distribute controlled substances |
| 21 USC s. 843(b) | use of a telephone communication facility to facilitate a drug felony |
| 21 USC s. 846 | conspiracy to possess with intent to distribute/distribute controlled substances |

The application is based on these facts:

See Attached Affidavit of Ryan Fergot

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Ryan Fergot*
*Applicant's signature*

Ryan Fergot, SA of the DEA
*Printed name and title*

Sworn to before me via reliable electronic means.

Date: __5/28/21_____

City and state: Dayton, Ohio

_____
Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

<u>AFFIDAVIT</u>

I, Ryan Fergot, having been duly sworn, do hereby state and depose as follows:

1.      I am a Special Agent with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation.   I have been employed as a Special Agent with the DEA since September 2018. In September 2018, I attended the DEA Academy which consisted of 17 weeks of training in conducting federal drug trafficking investigations; handling confidential sources; conducting undercover operations; conducting mobile, static, foot and electronic surveillance; conducting tactical entry and vehicle arrest operations; using defensive tactics and firearms; as well as additional aspects of conducting DEA lead investigations. I have been assigned to the DEA Dayton Resident Office since April 2019. Prior to employment with the DEA, I was a sworn Law Enforcement Officer of the State of Wisconsin who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Wisconsin, and employed by the City of Appleton Police Department from August 2014 to September 2018. During my employment with the Appleton Police Department, I was assigned to the Department's patrol division. During my time as a patrol officer, I conducted retail level drug investigations and I assisted the Appleton Police Department's Community Resource Unit (CRU) which included Narcotics Investigations, Prostitution and Pimping, Human Trafficking, and Criminal Street Gangs.

2.      Since the time of my assignment with the DEA, and during time spent as an Appleton Police Officer, I have been involved in narcotics-related arrests, executed search

1

warrants that resulted in the seizure of narcotics, and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## I.

### PURPOSE OF AFFIDAVIT

4.     I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area. The application seeks the issuance of search warrants for the following addresses:

a.     1035 Harvard Avenue, Fairborn, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 1). Target Residence 1 is more fully described in Attachment A, which is incorporated herein by reference.

b.     2837 Raxit Ct., Xenia, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 2). Target Residence 2 is more fully described in Attachment B, which is incorporated herein by reference.

c.     418 Lindenwood Road, Dayton, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 3). Target Residence 3 is more fully described in Attachment C, which is incorporated herein by reference.

d. 136 Cecil St., Springfield, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 4). Target Residence 4 is more fully described in Attachment D, which is incorporated herein by reference.

e. 1121 Broadway St., Springfield, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 5). Target Residence 5 is more fully described in Attachment E, which is incorporated herein by reference.

f. 1215 Creekview Court, Fairborn, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 6). Target Residence 6 is more fully described in Attachment F, which is incorporated herein by reference.

g. 3724 Applegate Avenue, Cincinnati, Ohio, including any curtilage, outbuildings, or garages at this location (hereinafter Target Residence 7). Target Residence 7 is more fully described in Attachment G, which is incorporated herein by reference. (collectively, "Subject Properties").

5. As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Subject Properties, including surrounding curtilage, outbuilding, or garages associated with those properties:

a. Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b. Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

3

c.      Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

6.      Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment H be found at the premises described above.

## II.

## PROBABLE CAUSE FOR SUBJECT RESIDENCES

### A.    DEA Links Quezada to Target Residence 1 and Drug Trafficking Activity

7.      The DEA is currently investigating a Dayton, Ohio based fentanyl and methamphetamine drug trafficking organization (DTO).   During this investigation, DEA has identified Clemente Quezada as an individual who coordinates the shipment and distribution of kilogram quantities of illegal drugs within the Dayton, Ohio region.   For instance, during early 2021, a confidential informant (CI) and cooperating defendant (CD) – both of whom have proven reliable given that law enforcement has been able to corroborate their information – identified Quezada as drug trafficker operating in the Dayton, Ohio area.   From these sources, DEA learned that Quezada often used the alias of "ManMan" or "MeMe" when trafficking controlled substances.

8.      DEA performed records checks concerning Quezada and learned that he was on parole with the state of Ohio for a drug offense committed in Hamilton County, Ohio.   Quezada listed his home address with parole authorities as Target Residence 1 – namely, 1035 Harvard, Fairborn, Ohio.

4

9.      During early 2021, DEA employed surveillance and consensually monitored calls to learn that Quezada used 937-219-9324 to coordinate the delivery of fentanyl and to collect payments from the sales of this drug.   Additionally, around this time, law enforcement began to monitor Quezada's movements to and from Target Residence 1.

10.     For instance, on or about February 23, 2021, investigators conducted surveillance during which Quezada met with Juana Elvira Arrechea-Gilbert, a truck driver from California.   Based on the events described below (as well as other information detailed in this affidavit), DEA has concluded that, on this day, Arrechea-Gilbert delivered bulk amounts of drugs to Quezada.   Additionally, the truck driver appears to have used her cellular telephone – namely, (951) 251-9539 -- to facilitate this drug transaction.   Specifically:

a.      During the morning of February 23, 2021, information from a court-authorized GPS tracking device on Quezada's Nissan showed this vehicle travel from Target Residence 1 to 2865 E. Sharon Rd, Cincinnati, Ohio.   DEA had no prior notice of Quezada's travel to Sharon Road.   Given the unexpected nature of the travel, DEA did not have physical surveillance units available to follow Quezada.   At that time, agents did not know whether Quezada's activity was legal or illegal.   Based on the tracker, the vehicle remained at the Sharon Road location for a short time and then returned to Quezada's house – Target Residence 1 – around noon.   Roughly an hour later, the vehicle departed the residence and traveled through Miami County, Ohio to Versailles, Ohio.

b.      Miami County Sheriff's Office (MCSO) located the Nissan – specifically at a Sunoco, 1327 E. Main St., Versailles, Ohio.   Upon doing so, MCSO maintained physical surveillance of Quezada and the Nissan.   (TFO Leininger provided MSCO with a driver's license

5

picture of Quezada, and the MSCO officer was able positively identify Quezada as the driver and sole occupant of the vehicle). Quezada departed in the Nissan from the Sunoco and began to drive around the area; his driving pattern suggested to MSCO that Quezada was unsure of where he was going. Ultimately, MSCO observed Quezada following a semi-trailer truck. The semi pulled into A1 Weaver Brothers Farm at 10638 SR 47, Versailles, Ohio, and stopped in the driveway. Quezada stopped behind the semi at the edge of the roadway. Carrying a large white package, the truck driver exited the semi and walked towards Quezada's vehicle. The truck driver gave the package to Quezada through the passenger side of the Nissan. Upon receiving the package, Quezada pulled away and left the area. Investigators tracked Quezada as he traveled back to his house – the Target Residence 1. When Quezada arrived at the residence, DEA saw him exit the Nissan carrying a large white bag that appeared to hold a box shaped item within it. Quezada carried the bag into Target Residence 1.

        c. An individual that appeared to be Mario Turner and driving Mario Turner's car (i.e., a vehicle registered to Turner) arrived at the residence sometime thereafter. Notably, based on toll records, Quezada attempted to contact Turner twice before Quezada began contacting and ultimately reaching the truck driver in the morning. After Quezada completed these initials contacts with the truck driver, he received an incoming call from Turner that last 21 seconds. In the afternoon, after Quezada met with the truck driver in Versailles and had returned to his residence, Quezada received an incoming call from Turner that last approximately 58 seconds. Sometime after that call, Turner arrived at the Quezada residence. Based on my training and experience and series of calls reflected in tolls, I believe that Turner was checking on the status of the shipment in the morning and, upon confirming that the shipment had been received in the afternoon, went to the Target Residence 1 to retrieve a portion of the load.

6

      d.     Meanwhile, law enforcement watched the semi as it departed A1 Weaver Brother's Farm and returned to the road.   Near Greenville, Ohio, a marked Ohio State Patrol (OSP) unit saw the semi commit a moving violation and stopped it.   During the traffic stop, OSP learned information concerning the truck driver – Juana Elvira Arrechea-Gilbert.   For instance, she showed her California commercial driver's license to OSP, and it identified her as Juana Elvira Arrechea-Gilbert.   Arrechea-Gilbert also provided her cellular telephone number – namely, (951) 251-9539 – to OSP.   She also shared numerous bills of lading including one from the delivery of spas and hot tubs covers to Watson's at 2721 East Sharon Road, Cincinnati, Ohio that day.   It should be noted that the location of this Watson's was approximately ¼ mile from the place on Sharon Road where Quezada's Nissan had traveled earlier that day.

      11.     During late March 2021 and again during early May 2021, DEA sought and received orders from the Honorable Thomas M. Rose, District Court Judge of the United States District Court for the Southern District of Ohio, authorizing interception of wire communications over telephone number 937-219-9324, the cellular telephone used by Quezada.   DEA has executed Judge Rose's orders, and during March, April and May 2021, it has intercepted wire communications between Quezada at 937-219-9324 and various individuals involving drug transactions as detailed below.

**B.**      <u>**Quezada Actively Uses Target Residence 2 to Store Controlled Substances and Drug Proceeds.**</u>

      12.     On or about April 1, 2021, Quezada engaged in a telephonic conversation with an individual identified as Mark Turner.   (Specifically, subscriber information and surveillance led to the identification of Mark Turner as the participant in this call with Quezada).   Pursuant

to the court's order, DEA lawfully intercepted this call, which is described below (with Mark

Turner identified as Mark):

| | |
|---|---|
| QUEZADA: | What up? |
| MARK: | Hello, how are you? |
| QUEZADA: | Good, what is the number? |
| MARK: | Uh, lots of partying? |
| QUEZADA: | [LAUGHS] |
| MARK: | Look. Hey, real quick, I just want to let you know I um, grab something, I don't know if you was low or out, but I wanted to, you know, hook you up, bruh and shit we burned almost all your shit up |
| QUEZADA: | Yeah, I almost out too. I'mma shit, I'mma get one. |
| MARK: | Okay, I didn't know if you still want to go to the Dispensary or you want to, you know, grab some of this, but either way I just want to let you know. |
| QUEZADA: | I took [Unintelligible] from there, but I wanna, I wanna get one of those uh, 'cause I don't wanna wait [YAWNS] I gotta go get my money from, from you guys. |
| MARK: | Mm-hum. Okay. |
| QUEZADA: | Mm-hum. Uh-huh. |
| MARK: | Well, when you get up and get movin', I'll be around here, I'mma run to the airport and pick my dude up, he in town from LA and um, guess we'll catch up here soon. |
| QUEZADA: | Hey, accept the call, bruh, accept the call. |
| MARK: | Okay. |
| QUEZADA: | Bruh, take the Facetime. |

8

MARK:              I know.

QUEZADA:       I said, accept your, the Facetime.

MARK:              Yeah, I just clicked it.

QUEZADA:       Hmm [Unintelligible].

MARK:              That didn't do nothin' (conversation ends)

Based on my training and experience, and knowledge of this investigation, I know that, during this conversation, Turner indicated that he had used the marijuana obtained from Quezada. Additionally, Quezada indicated that he needed to collect drug money Turner owed to him ("I gotta go get my money from, from you guys"). Based on my training and experience, I know that drug traffickers frequently front drugs to their customers and then later collect the drug proceeds from them.

Based on this conversation, DEA conducted surveillance on Target Residence 2 (2837 Raxit Ct., Xenia, Ohio), which is the known address of Mark Turner and observed Turner's Jeep parked at this location. A short time later, Turner exited Target Residence 2, entered his Jeep and then drove to various locations in Dayton. Later that day, Quezada left Target Residence 1 driving his Buick which was outfitted with a court-authorized tracking device. The Buick was tracked going directly to Target Residence 2.

13.    On or about May 11, 2021, Quezada conducted a phone call with an unidentified male at 470-652-0188 and engaged in the following lawfully-intercepted conversation with its user (UM0188):

UM0188:    What up?

QUEZADA:  Right here. I'm scared as fuck, bro. I went to the house and everything. [Voices overlap]

UM0188:    [Laughs] Nah, my son. [Voices overlap]

QUEZADA:     I said, this motherfucker don. -I said, this motherfucker done moving on me and everythin'.

UM0188:      Oh no, no, no, no. I got multiple houses, tho'. But listen, nah, I took my son uh, Universal for his Sixteenth birthday. I just got back from Florida this morning; Yesterday morning, yesterday night, I mean.[Voices overlap]

QUEZADA:     Oh, how everythin' goin' for you tho'?

UM0188:      [Laughs] Shit, dude.   The, the blue slow. I'm actually finished with the other one. Uh, and shit, if we can take care of that, if you want to or you wanna wait on everythin'?

QUEZADA:     No, no, no. We can take care of that, then I can give you somethin' else.

UM0188:      Yeah, hell yeah. 'Cause that, that, that is fine. I wanna keep it pushin'.

QUEZADA:     A'ight, so I, I just gotta out of Court right now, so I gotta go up to the crib. I gotta go out back that way get everythin' together and come see you.[Voices overlap]

Based on my training and experience, and knowledge of the circumstances of this case, I know that, during this call, Quezada inquired concerning the status of a previous drug delivery to UM0188.   UM0188 indicated that the pills received from Quezada (the blue) were moving slowly but that he had sold the other drugs.   Quezada then indicated that he could deliver additional quantities of controlled substances as he had just finished court and planned to obtain the drugs from a stash house (crib).   Around the time of this conversation, investigators monitored a court-authorized tracking device that had been installed on Quezada's car. Consistent with Quezada's discussions with UM0188, his car had travelled to Fairfield City Municipal Court, located at 675 Nilles Rd. Fairfield, Ohio.   Once his conversation with UM0188 ended, the tracking device on his car captured it travelling to Target Residence 2. Based on the conversation above, along with these movements, I believe that Quezada drove to Target Residence 2 to retrieve drugs from that location.   In short, Quezada stores drugs at Target Residence 2.

10

14.     Additionally, on or about May 18, 2021, Fairborn police and the Ohio Adult Parole Authority (APA) performed an unannounced visit to Target Residence 1 as part of a sweep both agencies conducted in that city.   (As noted above, Quezada is on active parole). During this incident, APA detained Quezada and searched his residence, discovering bulk amounts of cash in a safe as well as marijuana.   The agency, however, did not seize this currency.   APA did not violate Quezada.

a.     The following day, pursuant to the Court's order, DEA intercepted a call between Quezada and an unknown male identified herein as UM4126.   During their conversation, Quezada explained his encounter with the APA.   He acknowledged the bulk cash that APA had discovered in his home, but had not seized.   He advised that he "took all that shit out", indicating that he had moved this currency from Target Residence 1 to another location. Notably, during the call, Quezada admitted that he did not have a job.   I believe that the currency represented the proceeds of drug trafficking activity.

b.     DEA reviewed pole camera footage at Target Residence 1 and GPS tracking data from the Buick following the May 18, 2021 APA visit.   Immediately after law enforcement left, Quezada walked to his Buick carrying a bag, entered the vehicle, and drove away.   GPS data from the court-authorized tracking device on that vehicle captured it traveling directly to Target Residence 2 and then returning to Target Residence 1.   Based on physical and electronic surveillance, on or about May 19, 2021, Quezada travelled to Target Residence 2 on two separate occasions.   Given these multiple visits to Target Residence 2 following the APA visit to Target Residence 1, I believe that Quezada uses Target Residence 2 as a stash house or location at which to store contraband including drugs and the illegal cash proceeds from the sale of controlled substances.

C.    **Quezada also Continues to Systematically Use Target Residence 1 as Part of his
      Drug Operation.**

15.    Following execution of the court's authorization to intercept wire

communications over Quezada's telephone, he continued to use Target Residence 1 as a base of

operations for his drug trafficking activity.    For instance, on or about April 7, 2021, DEA

performed physical and electronic surveillance on Target Residence 1.    That morning, DEA

saw a black Honda Accord and Quezada's Buick parked in tandem on the street in front of

Target Residence 1.    Two individuals – believed to be Quezada and Jonathan Lopez – were

seated in the Buick.    Both men then exited the vehicle, but then returned to it.    With both men

in it, the vehicle departed and then returned to the front of Targett Residence 1 approximately

five minutes later.    Both men exited the vehicle and stood nearby.    Sometime thereafter, DEA

saw Lopez enter the Honda Accord and leave Target Residence.    Shortly before noon, Ohio

State Highway Patrol (OSP) stopped LOPEZ's vehicle for a traffic violation.    During this

incident, OSP recovered a large amount of suspected fentanyl – approximately 286.00 gross

grams – from Lopez's possession.    During a post-Miranda interview, Lopez explained that he

had obtained these drugs earlier in the day from "MeMe," who lived somewhere in Dayton,

Ohio.    During a consent search of Lopez's phone, OSP observed a contact with the title of

"MeMe"; the contact information for "MeMe" corresponded to Quezada's phone number of

937-219-9324.    OSP also observed a WhatsApp's conversation thread between Lopez and

Quezada in which Quezada provided his address as Target Residence 1.    These events indicate

that Quezada uses Target Residence 1 to store drugs.

16.    On or about April 29, 2021, DEA conducted physical and electronic surveillance

of Quezada and watched as he left Target Residence 1 carrying a duffle bag, which he placed in

his vehicle.    Quezada left the area in the vehicle and traveled to northeastern Ohio.    DEA

maintained surveillance as as he traveled to 7335 Newport SE Uhrichsville -- a manufacturing facility. Upon arrival at the facility, Quezada parked next to a semi-truck. Investigators observed a Hispanic female, later confirmed to be Juana Elvira Arrechea-Gilbert (previously discussed above). Arrechea-Gilbert retrieved the duffle bag from Quezada's car and placed it in her semi. DEA maintained physical surveillance on Arrechea-Gilbert and the semi-truck as she traveled to a nearby truck stop. Arrechea-Gilbert stayed at the truck stop for numerous hours. On April 30th, 2021, after constant surveillance on Arrechea-Gilbert as she traveled to northwestern Ohio, a traffic stop was eventually conducted on the semi-truck. The traffic stop led to a consent search of the vehicle. The search resulted in the discovery of a large amount of U.S. currency, found inside the cab of the semi-truck. Arrechea-Gilbert was interviewed by investigators and confessed that the money belonged to a drug cartel in Mexico, and she was tasked with picking up the illegal drug proceeds from Quezada. She also acknowledged previously delivering bulk amounts of controlled substances to Quezada. Based on the foregoing, Quezada uses Target Residence 1 to store drug proceeds, portions of which he transfers to couriers who work for his source of supply.

C.    **A Member of Quezada's Organization – Daryll Lee – Uses Target Residence 3 as a Base of Operation**

17.    During May 2021, DEA identified a member of Quezada's organization, Daryll Lee, and tied his drug trafficking activity to Target Residence 3 (418 Lindenwood Road, Dayton, Ohio). For instance, on or about May 11 and 12, 2021, DEA lawfully intercepted a series of calls between Quezada and the user of 937-219-0721 – later identified as Lee. In the first of these conversations – which occurred on or about May 11, 2021 – Quezada agreed to deliver a sample of controlled substances to Lee the following day.

13

18.     On or about May 12, 2021, consistent with the intercepted call the preceding day, Quezada and Lee engaged in additional conversations that consummated the delivery of the drug sample.   During the first lawfully intercepted call on May 12, 2021, Lee confirmed that he planned to receive the sample that day.   Through additional lawfully intercepted calls, the men agreed to meet at a gas station near DJ's Auto Shop in Dayton, Ohio.   Around the time of these conversations, DEA tracked Quezada as he left Target Residence 1 and arrived at a Marathon station near the auto shop.   DEA also saw a Tahoe arrive at this location.   (Notably, Lee has advised that he would be driving a Tahoe to the deal).   DEA saw Lee exit the Tahoe, enter Quezada's vehicle for a short time, and then return to the Tahoe.   (DEA identified Lee from a comparison of a photograph from a law enforcement database).   Based on my training and experience, I know that this type of encounter is consistent with a drug transaction – namely, a brief encounter at a random location where the parties can exchange contraband in the hopes of minimizing detection.   Surveillance traced Quezada back to Target Residence 1 following this deal.

19.     DEA followed Lee and the Tahoe as they departed the Marathon.   After briefly losing sight of the vehicle, law enforcement again located it backed into the driveway of Target Residence 3.   DEA maintained surveillance of the Tahoe parked at Target Residence 3 and, after a time, it drove from this location; DEA identified Lee as the driver of the vehicle.

20.     DEA performed record checks concerning Target Residence 3 and Lee.   During previous encounters with law enforcement, Lee had provided Target Residence 3 as his address. Additionally, I reviewed a Dayton Police Department report from 2018 concerning a search warrant that local police had executed at Target Residence 3 involving Lee.   Specifically, during February 2018, DPD obtained a search warrant for Target Residence 3 for evidence of

14

drug crimes. During the search, officers recovered ammunition as well as suspected fentanyl from the home. They also encountered Lee at the house and placed him under arrest. Following this incident, law enforcement reviewed Lee's jail calls during his detention. In one recorded conversation, Lee instructed another individual to secure a quantity of drugs hidden in a toilet at Target Residence 3 that law enforcement had overlooked during the search. In short, Lee has a historical association with Target Residence 3 and drug trafficking activity.

21.     During late May 2021, DEA obtained warrants authorizing the collection of location information from Lee's cellular telephone – namely, 937-219-0721. On or about May 27, 2021, DEA executed these warrants, which placed on that day at Target Residence 3 the cellular device that Lee used to arrange the drug transaction with Quezada. Additionally, at that time, DEA also observed parked at Target Residence 3 the Tahoe that Lee drove to the transaction.

**D.**     **Quezada Delivers Drugs from Target Residence 1 and 2, which other Individuals Then Transfer to Target Residence 4 and 5.**

22.     On multiple times during this investigation, electronic and physical surveillance placed Quezada traveling to, and in the vicinity of, the O'Reilly Auto Parts, 1411 Parker Ct., Springfield, Ohio 45504. During these incidents, Quezada traveled to the area of store, remained their briefly, and then returned to his home as Target Residence 1. Based on my training and experience, I know that drug traffickers will often make short trips to public places where they will meet customers and complete drug transactions. Quezada's travels to this auto store miles from home appears consistent with drug trafficking activity.

23.     On or about May 10, 2021, surveillance from a pole camera captured Quezada leaving his home at Target Residence 1 and entering his Buick Enclave. A court-authorized

tracking device on that vehicle showed Quezada travelling from Fairborn to O'Reilly's Auto Parts in Springfield, Ohio.   Shortly thereafter, DEA TFO Jason Via located Quezada's unoccupied vehicle parked at the auto part store.   The TFO soon observed a gray BMW X5, bearing Ohio registration of JFN4775, pull into the lot and parked near Quezada's car.   A registration check placed the vehicle in the name of Alejandra CRUZ of 136 Cecil St. Springfield, Ohio (Target Residence 4).

a.      An Hispanic male, who Springfield Police Department later identified as Jorge Garza, exited the passenger seat of the BMW and walked over to the driver's side of Quezada's Buick.   TFO Via saw Garza enter the driver's side of the Buick and then shortly thereafter exit it.   Garza then returned to the BMW.    The driver of the BMW – whom TFO Via later identified as Edson Cruz-Medina – exited the vehicle and entered the O'Reilly's store. (Law enforcement knows Cruz-Medina as a relative of the BMW's registered owner).   A short time later, law enforcement observed Quezada and Cruz-Medina leave the store and return to their respective vehicles.

b.      Investigators followed the BMW to Target Residence 5 (namely -- 1121 Broadway St. Springfield, Ohio).   Springfield Police Department investigations previously linked Cruz-Medina to Target Residence 5.   At that location, Garza exited the BMW and carried a bag-type item toward a trash can.   The BMW then left this location.

c.      After this incident, DEA reviewed footage from the pole camera at Target Residence 1 from when Quezada had left his home earlier in the day when travelling to Springfield.   The footage showed that, upon entering his Buick at Target Residence 1, Quezada appeared to remove a white object from his waist band.   The object was rectangular in shape and approximately one foot in length.   As detailed above, after removing this object, Quezada

16

travelled to Springfield and met with Garza. Based on my training and experience, as well as information developed throughout the investigation, I know that the object Quezada removed from his waist band was indicative of a packaged kilogram of an illegal drug. Moreover, based on the foregoing, I conclude that Quezada delivered controlled substances to Garza and Cruz-Medina during the events that occurred at the O'Reilly Auto Parts in Springfield.

24.     On May 17, 2021, law enforcement performed a trash pull at Target Residence 5. The BMW from the May 10, 2021 incident at O'Reilly Auto Parts was parked at Target Residence 5. Investigators retrieved the trash, which had been placed near the sidewalk, and transported it to a secure location to search its contents. Law enforcement recovered numerous plastic baggies that contained blue and white powdered residue. They also discovered approximately 10 blue pills marked with an "M" and "30". The Springfield BCI lab field tested the baggies and pills, and they indicated positive for fentanyl. Notably, during this investigation, in early 2021, Quezada sold identical blue pills to a confidential informant during a controlled purchase performed under the direction and supervision of DEA. Likewise, on or about May 13, 2021, DEA conducted surveillance on Quezada during which he appeared to conduct a drug transaction in the parking lot of the Fairfield Commons Mall. Law enforcement later stopped the suspected purchasers of Quezada's drugs and found them in possession of four ounces of identical blue bills with "M" and "30" markings. In sum, I believe that the pills recovered from the trash at Target Residence 5 came from Quezada.

25.     On or about May 24, 2021, based on the events below, I believe that Quezada delivered drugs to Springfield once more. Specifically:

17

      a.     Springfield police installed a state-court authorized GPS tracking device on the BMW described above. Later that day, electronic surveillance placed Quezada's Buick at Target Residence 2. Shortly after visiting Target Residence 2, the Buick travelled to the O'Reilly Auto Parts in Springfield.

      b.     Local police responded to the auto parts store, but were unable to arrive in time to see with whom Quezada had met. Around that time, however, Springfield police observed a Hispanic male, believed to be Cruz-Medina, enter Target Residence 5. As he did so, a white Mercedes registered to, and being driven by, Garza was pulling from Target Residence 5. Garza then travelled to La Condesa Grocery Store, in Springfield, Ohio; La Condesa provides a money remitting service. Based on my training and experience, I know drug traffickers from this area regularly use La Condesa to electronically transfer drug proceeds to Mexican based sources of illegal drug supply.

      c.     Meanwhile, the tracking device on the BMW captured it departing Target Residence 5 and travelling to Target Residence 4. Physical surveillance placed Cruz-Medina as the driver of the BMW. Law enforcement saw a Hispanic male carrying a bag exit the BMW and enter Target Residence 4. The BMW then left the area.

      d.     Based on the events and information developed during this investigation, I believe that Quezada met with Cruz-Medina and Garza in Springfield to conduct a drug transaction. Prior to the May 24, 2021 event, Quezada travelled to Target Residence 2 – a known stash house -- and then promptly drove to the O'Reilly store – the location at which he delivered drugs to Cruz-Medina and Garza on May 10, 2021. Following this delivery, Quezada's customers travelled to Target Residence 4 and Target Residence 5. Also, it should be noted that Cruz-Medina lists Target Residence 4 on his driver license. Given this

18

information, I believe that Quezada's customers are using Target Residence 4 and Target Residence 5 to store items used in the trafficking and processing of drugs.

e.     Additionally, Target Residence 4 previously has drawn the attention of law enforcement.   Specifically, on or about August 6, 2020, DEA Diversion investigators discovered a shipment of pill-binding agent destined for Target Residence 4.   I know that drug traffickers commonly use a pill-binding agent along with illegal pill presses to make counterfeit or illegal pills, such as fentanyl pills.   Drug traffickers commonly press their own pills in an effort to disguise their contraband nature.   I know at the time of this shipment Cruz-Medina was linked to Target Residence 4.

### E.     A Member of Quezada's Organization Uses Target Residence 6 as a Base of Operation.

26.     As previously detailed above, on or about May 11, 2021, DEA lawfully intercepted a call between Quezada and the user of 470-652-0188, identified herein as UM0188. During this conversation, UM0188 confirmed an earlier delivery of pills and other controlled substances from Quezada.   The two men also agreed to a subsequent drug delivery.

27.     On or about May 17, 2021, DEA performed surveillance on Quezada as he left Target Residence 1 in his vehicle, picked up his daughter from school and then travelled to Walmart in Beavercreek, Ohio.   Quezada and his daughter then entered this store.   Around this time, DEA lawfully intercepted a series of calls between Quezada and UM0188 at 470-652-0188.   For instance:

a.     At approximately 2:23 p.m., DEA intercepted a call during which Quezada and UM0188 agreed to meet at the Walmart in Beavercreek.   At approximately 2:50 p.m., law enforcement observed a white GMC Yukon, bearing Ohio registration HMB1801 enter

the Walmart parking lot.   This vehicle was registered to Michael Cunningham at 141 Rockwood
Avenue, Dayton, Ohio.

       b.    Soon thereafter, Quezada exited the Walmart with his daughter.   Around
that time, DEA intercepted another call between Quezada and UM0188 in which the men
acknowledged that they saw each other in the parking lot.   Quezada walked to his car and
opened its rear hatch.   The Yukon – which had a lone occupant – approached Quezada.
Quezada then entered the front passenger seat of the Yukon; he and UM0188 pulled away only
to stop in the next parking row.   Quezada exited the Yukon and returned to his own car.
Quezada then returned to Target Residence 1.   Based on my training and experience as well as
Quezada's practice of performing drug transactions in public places (which has been observed
throughout this investigation), I believe that Quezada delivered drugs to UM0188 during this
transaction.

       c.    At approximately 2:59 p.m., DEA investigators observed UM0188 leave
in the Yukon and ultimately travel to the area of Black Lane in Fairborn, Ohio.   After briefly
losing sight of the vehicle in this area, DEA found it parked in front of Target Residence 6.
Investigators also observed parked in the driveway of Target Residence 6 a Chevrolet Silverado
bearing Ohio registration EPM9448.   This vehicle was also registered to Cunningham.   Given
that the Yukon travelled directly from Walmart to Target Residence 6 following completion of
this drug transaction, I believe that UM0188 uses Target Residence 6 to store and to process
controlled substances.

      28.    DEA conducted a record check on Cunningham.   In doing so, investigators
learned that he is on active parole to the state of Ohio.   He has provided Target Residence 6 as
his home address with parole authorities.

20

29. On or about May 19, 2021, DEA conducted a spot check at Target Residence 6. While doing so, investigators observed the Yukon and Silverado – both of which are registered to Cunningham – parked at Target Residence 6.

**F. A Member of Quezada's Organization – Tiun Todd, a.k.a. "Tito" – Uses Target Residence 7 to Store Controlled Substances.**

30. On or about April 14, 2021, Quezada conducted a phone call with the user of 513-808-2672 (later identified through surveillance as Tiun "Tito" Todd) and engaged in the following lawfully-intercepted conversation with its user (identified as Todd):

QUEZADA    Hello?

TODD    Hello, what's up homie?

QUEZADA    What's up?

TODD    Hey, this uh, Pollo, Pollo told me to give you a call. I was supposes to be comin' and get a picture.

QUEZADA    Yeah, yeah, yeah.

TODD    Yeah.

    [Voices Overlap]

QUEZADA    Who this?

TODD    This, this T, this um, this Tito.

QUEZADA    Tito?

TODD    Yeah.

QUEZADA    Okay, Okay, shit. I'm all the way uh, in Dayton.

TODD    Yeah, that ain't no issue. I ain't, I ain't trippin' 'bout that. I almost, prolyl they give me a lady friend on the road in a minute. You feel me? It ain't nothin' but a tester, but you know, from there we, when it's time . . .

    [Voices Overlap]

21

QUEZADA        Yeah, um.

TODD           . . . when it's time for us to talk, I'll just come back face to face with you. You feel me?

QUEZADA        Why you don't just um, link up tomorrow morning? 'Cause I have somethin' to do with the family in a little bit.

TODD           A'ight, that's cool too. That's cool too. Tomorrow morning is a good time, so shit.

QUEZADA        Alright.

TODD           What you want me . . .

QUEZADA        A'ight. Oh.

TODD           Want me to just call you tomorrow morning?

QUEZADA        Yeah, yeah and I'mma shoot you an address, so we could meet up halfway or something.

TODD           A'ight, say less brother. Be good man.

QUEZADA        A'ight.

TODD           Have a good time with the family.

QUEZADA        You too.

TODD           A'ight, peace. Yeah.

QUEZADA        A'ight.

Based on my training and experience, I believe that, during this call, Todd agreed to send an unknown woman to meet with Quezada the following day to obtain a sample of controlled substances.

31.     On or about April 15, 2021, Quezada called an unknown female (UF) and advised that she should let him know she was 15 minutes away.   This woman appeared to work for Todd.   That same day, Quezada left Target Residence 1 and drove to a Burger King in

22

Beavercreek, Ohio. A gray Nissan with California registration 8RBK685 parked next to

Quezada. Quezada entered the rear passenger side of the Nissan and remained in it for

approximately one minute before returning to his own vehicle. DEA followed the Nissan as it

travelled onto Interstate 75 where OSP stopped it for a traffic violation. OSP identified the

occupants of the car as Richard Watson and Danae Spruill.

       32.    On April 15, 2021, Quezada conducted a phone call with Todd and engaged in

the following lawfully-intercepted conversation with him (identified as Todd):

| | |
|---|---|
| QUEZADA | Hello? |
| TODD | Homie. |
| QUEZADA | What's up? |
| TODD | What up, tho? Hey, bouta uh, 'bouta shoot back up the other way man. With a five right? Uh, a little way of five, a nickel. Uh, not that, not five, or five K, you hear me? |
| QUEZADA | Uh, you wanna do that tomorrow? |
| TODD | Shit, I was trying to get it all, but a list. That's why I was telling you . . . prolyl not. I'll be at [Unintelligible] store, you know what I mean? I'm, I'm tryna . . . |
| QUEZADA | Yeah. Yeah. |
| TODD | I'm tryna to establish this treadmill, and get that thing going. [Stutter] I'll sweat shit it out, bro. |
| QUEZADA | Yeah, [Stutters] I usually be going in the morning, you feel me? |
| TODD | A'ight, well shit. That is what's gone have to be, unless I move. But, shit, hey, shit, I'm hungry man. I say when you holler at him, let him know, like, so we ain't gotta keep doing the running back and forth buyin' either. You know what I mean? Send me somebody down there, that way man, they can sit with me, you know what I mean? Or, whatever that case, you know what I mean? Or . . . |
| QUEZADA | Yeah. |
| TODD | . . . shit, put [Stutter] double what I said, you feel me? So, I ain't gotta keep running back like that, bruh. |

| QUEZADA | So, you, you wanna uh, five K, you said you got? |
|---|---|
| TODD | Yeah. |
| QUEZADA | A'ight |
| TODD | Hey, hey, hey, mostly on the wap though, you hear me? But, I, I do want some of those uh, M&M's too though. |
| QUEZADA | A'ight |
| TODD | A'ight, yup. |
| QUEZADA | A'ight. |

Based on my training and experience, I believe that, during this call, Quezada and Todd arrange a future drug deal. Todd indicated that he mostly wanted powdered fentanyl (wop) but would also accept fentanyl pills (M&M).

33. On April 16, 2021, Quezada left Target Residence 1 and drove to the Walmart in Beavercreek. Once there, he parked next to a white Mercedes Benz SUV with Ohio registration JGU3263, which is registered to Todd. DEA investigators saw Todd exit his car, enter Quezada's vehicle and remain there for a few minutes. Todd exited the car and went into the Walmart. Quezada then moved his car next to a black Mazda SUV with Kentucky registration BFL966, which is registered to Avis Rental Company. DEA investigators observed an African American male get out of the front passenger seat of the Mazda and then got into the Buick with Quezada. The Buick and the Mazda then left the parking lot, where physical surveillance was lost. DEA investigators were able to find the Mercedes and Mazda approximately one hour later driving together on Interstate 75 southbound. DEA maintained surveillance on both the Mercedes and the Mazda until they both took the Paddock road exit off Interstate 75 in Cincinnati, Ohio. DEA investigators observed the Mazda run a red light at the intersection of Paddock Road and Vine Street. At this time, surveillance on the Mercedes was

24

lost. DEA investigators were able to find the Mazda nearby, where OSP conducted a traffic stop. The occupants of the Mazda were Watson and another individual. During a search of the Mazda, OSP Troopers found a small amount of marijuana, and large trash bags containing blenders and other drug paraphernalia. Based on the foregoing events, I believe that Quezada delivered controlled substances to Todd.

34.     On April 27, 2021, at approximately 8:48 am, DEA watched Quezada leave Target Residence 1 with a red drawstring bag and enter his vehicle. Quezada then drove to the Cincinnati area and parked in front of Target Residence 7. Quezada then walked toward Target Residence 7, but surveillance lost sight of him before he entered it. However, approximately three (3) minutes later, Quezada was observed walking out of Target Residence 7, carrying a red drawstring bag. He returned to his car and drove away. While Quezada was at Target Residence 7, DEA observed parked at the location a white Mercedes Benz SUV like that previously driven by Todd as well as Dodge Ram pick-up truck.

35.     On or about May 11, 2021, DEA watches as Quezada left Target Residence 1 and drove to the Fairfield Commons Mall. Once there, Quezada parked and met with a man (later identified as Todd) who exited a Dodge Ram pickup truck with Ohio registration of HUK5975. The Dodge Ram is registered to Ericka Todd at Target Residence 7. Specifically, Todd entered Quezada's car and remained there for a brief time. Todd then exited the Quezada's vehicle and then entered the mall with a woman. Based on my training and experience, as well as my familiarity with the facts of this case, I believe that Quezada and Todd met to a complete a drug transaction involving either the delivery of controlled substances or the payment thereon.

36.     DEA has conducted spot checks at Target Residence 7.   As recently as May 17, 2021, Todd was observed at Target Residence 7.

37.     Based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a.      It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b.      It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.      That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.      It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.      It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.      It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.   Drug traffickers commonly front (provide drugs on consignment) to their clients.   The books, records, receipts,

notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.      It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.      That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.      When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit.   Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.   Drug traffickers frequently keep such records at their residences or at stash houses.

j.      Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.   Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

k.      It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates

in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list. Drug traffickers frequently keep such materials at their residences or at stash houses.

l.      Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.      Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms and ammunition of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.      The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes

add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

       p.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

       q.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

        r.      Drug traffickers often use computers to perform research concerning travel plans to meet sources of supply, store photographs of associates, drugs, firearms, and other contraband.

        s.      Drug traffickers frequently maintain at their residences or stash houses controlled substances as well as items used to process, sell and distribute these illegal drugs such presses, scales, baggies, vacuum sealers, cutting agents, gloves, masks, and other items.

    38.      Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described locations.

Respectfully submitted,

*Ryan Fergot*

_____

Ryan M. Fergot
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this  28 th day of May 2021.

_____

Sharon L. Ovington
United States Magistrate Judge

30

**ATTACHMENT G**

**PROPERTY TO BE SEARCHED**

3724 Applegate Avenue, Cincinnati, Ohio, including all rooms, attics, basements, surrounding grounds, curtilage, storage areas, outbuildings and vehicles at this location. The **Target Residence** is more fully described as a single story, single family structure, with blue siding and a reddish brown roof, there is a covered porch with white trim that covers the front of the residence. The numbers 3724 are listed in a dark color on the door frame above the door.   The residence is depicted below:



### ATTACHMENT H

I submit that there is probable cause to search for evidence, contrabands and fruits of violations of 21 USC § 841(a)(1), 843(b), and 846, including, but not limited to the following items:

A.    Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.    Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.    Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.    Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.    Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.    United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.    Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H.    Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I.    Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J. Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K. Firearms and ammunition.

L. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.